1-00-3950 First Division

June 10, 2002

JAMES J. PETRE, JR., and JANE PETRE, ) Appeal from the

) Circuit Court of

Plaintiffs-Appellees, ) Cook County.

)

v. ) 

) 98 L 13737

VINCENT A. KUCICH and CARDIOVASCULAR
 ) 

CONSULTANTS, S.C.,d/b/a )
 

Cardiovascular Medical Associates, S.C., 
 ) The Honorable

) Sharon Johnson Coleman,

Defendants-Appellants.
 ) Judge Presiding.

PRESIDING JUSTICE COHEN delivered the opinion of the court:

Following a heart attack, plaintiff James Petre underwent coronary artery bypass surgery at St. Francis Medical Center.  A postoperative
 
wound infection developed, ultimately necessitating both the removal of Petre's sternum and additional reconstructive surgery.  Petre and his wife, Jane, brought a medical malpractice action against 
Dr. Vincent Kucich, who performed the bypass surgery, Kucich's practice group, Cardiovascular Medical Associates, S.C. (CMA), St. Francis Medical Center, Dr. Hershel Wix, Dr. Wix's partners (Drs. David Looyenga, Robert Prentice and George Gustafson) and Dr. Wix's partnership, Hickory Cardiology Associates, Ltd.  Certain Hickory physicians were responsible for plaintiff's postoperative monitoring and care.
  

Prior to trial,
 plaintiffs settled with and dismissed St. Francis Medical Center.  Plaintiffs also dismissed Drs. Wix, Looyenga, Prentice and Gustafson, as well as Hickory Cardiology Associates, Ltd.

Following a jury trial, the circuit court entered judgment in the amount 
of $465,000
 on a verdict rendered in favor of plaintiffs and against defendants Kucich and CMA.
 

On appeal, defendants argue that the trial court erred in relying on 
Spain v. Owens Corning Fiberglass Corp.
, 304 Ill. App. 3d 356 (1999),
 in excluding evidence of the alleged negligence of the previously dismissed Hickory physicians, thus preventing defendants from asserting the so-called "empty chair" defense
, 
i.e.
,
 from claiming that postoperative negligence on the part of the dismissed Hickory physicians
 was the sole proximate cause of Petre's injuries.  Defendants contend that the trial court's decision to exclude such evidence and subsequent refusal to tender an appropriate jury instruction on sole proximate cause (Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989) (hereinafter IPI Civil 3d No. 12.04)) denied defendants a fair trial.

Defendants also argue that the trial court erred in: (1) precluding defendants from presenting the expert testimony of Dr. Daniel Hirsch with respect to the use of prophylactic antibiotics; and (2) allowing improper impeachment of defendants' expert Dr. Ronald Curran with what defendants claim to be a prior consistent statement.  Finally, defendants assert cumulative error predicated on: (1) the trial court's rulings during 
voir dire
 and on certain other motions 
in limine
; (2) the trial court's comments before the jury with respect to a defense witness; and (3) comments by plaintiff's counsel during closing arguments. 

  We find that the trial court misapplied 
Spain
 and erred as a matter of law both in precluding evidence of the dismissed Hickory physicians' conduct 
and in refusing to give the appropriate jury instruction, thereby denying defendants a fair trial.  For the reasons that follow, we reverse the judgment of the trial court and remand for a new trial.  

BACKGROUND

On November 17, 1996, plaintiff James Petre suffered a heart attack and was taken to the emergency room at St. Mary's Hospital in Kankakee, Illinois, where he received cardiopulmonary resuscitation and was placed on a ventilator.  Dr. Hershel Wix, a cardiologist, evaluated defendant at St. Mary's
 and recommended that he be transferred to St. Francis Medical Center in Blue Island, Illinois, to undergo a triple coronary artery bypass graft (CABG).  Dr. Wix admitted Petre to St. Francis and was one of five cardiologists whose treatment stabilized Petre's heart over the next eight days.  

Along with other medical problems, doctors suspected Petre suffered from aspiration pneumonia, which results when digestive materials are partially regurgitated and inhaled into the lungs.  Petre's attending cardiologists consulted with a Dr. Vaishnov, a pulmonary disease specialist.  In order to manage Petre's suspected pneumonia,
 Dr. Vaishnov and Petre's attending cardiologists administered the antibiotics Ancef, clindamycin and ceftazidime prior to the CABG procedure.

On November 26, 1996, Dr. Kucich performed Petre's CABG surgery and thereafter
 continued Petre on a regimen of both clindamycin and ceftazidime.  Pursuant to standing orders of the physicians at St. Francis Medical Center and after conducting his own clinical evaluation, Dr. Kucich elected not to prescribe vancomycin to Petre as a postoperative prophylactic antibiotic.  (Prophylactic antibiotics are utilized
 to prevent bacteria, including those  normally present on the skin, from infecting a surgical wound.)  

After the CABG procedure, Dr. Kucich and assisting surgeon Robert Applebaum tracked Petre's progress for the initial two-day postoperative period.  In accordance with the custom and practice of St. Francis Medical Center, Petre's attending physicians
 then managed
 his
 clinical care.  Cardiologists, including Drs. Looyenga and Gustafson, as well as the nurses and staff of St. Francis Medical Center, managed 
Petre's day-to-day postoperative care, including observing the surgical wound, evaluating Petre for discharge and signing his eventual discharge order.

On December 2, 1996, the date of Petre's discharge
, a St. Francis nurse took a culture sample from Petre's surgical wound
.  A resulting lab report directed to Dr. Gustafson
 indicated the presence of methycillin-resistant 
Staphylococcus epidermis
 (MRSE) bacteria, a strain against which the various antibiotics Petre was taking had little effect.  Dr. Looyenga examined Petre and approved his discharge.  At the time of Petre's discharge, Dr. Kucich was unaware of the results contained in the lab report.  Dr. Kucich
 had no further clinical contact with Petre
 following his discharge.

Beginning on December 6, 1996, Dr. Wix followed Petre's recovery from Wix's office in Kankakee.  Dr. Wix, examining Petre on December 6, 1996,
 found no outward sign of any difficulties with Petre's surgical wound.  Petre made further follow-up visits to Dr. Wix on December 10, 13 and 20, 1996.  On each of these visits, Dr. Wix noted a "serous [watery] discharge" from Petre's surgical wound.  During a  subsequent office visit on January 3, 1997, Dr. Wix noted a worsening of the condition of Petre's  sternal wound and suspected the presence of a bacterial infection.

Dr. Wix referred Petre to an infectious disease specialist, Dr. Daniel Hirsch, who diagnosed Petre with a sternal wound infection.
(footnote: 1)  Due to the severity of the infection, Dr. David Dreyfuss (a consulting plastic surgeon) performed a "debridement" (removal of contaminated and/or dead tissue) and removal of Petre's sternum, as well as further reconstructive surgery.  Dr. Dreyfuss continued to monitor Petre's status and on May 1, 1997, released Petre to return on an as-needed basis.     

  Petre and his wife, Jane, subsequently filed suit against, 
inter alia
, 
both Dr. Kucich personally and Kucich's practice group, Cardiovascular Medical Associates, S.C. (CMA), alleging negligent failure to prescribe the antibiotic vancomycin, which is effective against MRSE bacteria, on a prophylactic basis.  The Petres' complaint further alleged that defendants: (1) prescribed excessive amounts of corticosteroids, thereby predisposing Petre to infection; (2) failed to recognize the presence of an infection prior to Petre's discharge from St. Francis on December 2, 1996; (3) failed to respond appropriately to the lab report identifying the nature of the infection; and (4) failed to provide responsible surgical follow-up after Petre's discharge from St. Francis Hospital.  Plaintiffs' complaint alleged similar negligence on the part of Drs. Wix, Looyenga, Prentice and Gustafson (the Hickory physicians), as well as their partnership, Hickory Cardiology Associates, Ltd., and St. Francis Medical Center.

 Just prior to trial,
 plaintiffs settled with and dismissed St. Francis Medical Center.  Plaintiffs also dismissed the Hickory physicians
 and 
Hickory Cardiology Associates, Ltd. 

Plaintiffs then moved 
in limine
 to bar defendants from presenting evidence that the Hickory physicians had been joined as defendants in the lawsuit but were then dismissed, and from eliciting or referring to any standard of care opinions concerning the Hickory physicians (hereinafter Plaintiffs' Motion 
in limine
 No. 2).  After initially ruling that defendants would be permitted to submit evidence
 of the Hickory physicians' conduct at trial
, the trial court reversed itself and excluded any such evidence in reliance on 
Spain v. Owens Corning Fiberglass Corp.
, 304 Ill. App. 3d 356 (1999).  The trial court also refused to give 
a jury instruction on sole proximate cause (IPI Civil 3d No. 12.04).

The sole issue presented to the jury was whether Dr. Kucich negligently failed to administer the antibiotic vancomycin to Petre prior to performing Petre's bypass surgery.  Plaintiffs' theory was that had Kucich prescribed vancomycin prior to surgery, Petre would not have developed the MRSE infection that ultimately resulted in the removal of his sternum and subsequent reconstructive surgery.  No issue was raised, nor was any expert testimony presented, regarding any care Dr. Kucich
 provided after Petre's November 26, 1996, CABG surgery.

On June 9, 2000, the jury returned a verdict in favor of plaintiff James Petre and against defendants Dr. Kucich and CMA in the amount of $465,000; however, the jury denied Jane's claim for loss of society.  The trial court entered judgment on the verdict accordingly.

Defendants moved to vacate the judgment entered on the jury verdict and for judgment notwithstanding the verdict, or in the alternative for a new trial.  Defendants further moved pursuant to section 2-1205 of the Code of Civil Procedure (735 ILCS 5/2-1205 (West 1998)) for a remittitur in the amount of $5,000 to reflect the settlement in favor of St. Francis Medical Center.  The trial court denied defendants' motions for judgment notwithstanding the verdict and for a new trial, but granted the motion for remittitur.
  This appeal followed.

ANALYSIS

I. Sole Proximate Cause

Generally, the admissibility of evidence is a matter committed to the sound discretion of the trial court, and its decision will not be reversed on review absent a clear abuse of that discretion.  
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83, 92 (1995).  However, because the relevant facts are undisputed and because the trial court excluded proposed evidence based solely on its interpretation of case law, our review is 
de novo
.  
Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.
, 181 Ill. 2d 214, 218 (1998). 

Plaintiffs' expert, Dr. Barry Fields,
 opined during discovery that the Hickory physicians were negligent in failing to detect and treat Petre's infection before sternal debridement and reconstructive surgery became necessary.  In ruling on Plaintiffs' Motion 
in limine
 No. 2, the trial court stated that defendants would be allowed to elicit evidence of the Hickory physicians' alleged negligence solely in the context of cross-examination of Dr. Fields with respect to that opinion.  Over defendants' objection, however, the trial court later reversed itself and barred any such evidence, relying on 
Spain v. Owens Corning Fiberglass Corp.
, 304 Ill. App. 3d 356 (1999).
  

In 
Spain
, Shirley Spain, as administrator of her deceased husband's estate,
 
filed suit against several asbestos manufacturers, including the Owens-Corning Fiberglass Corporation, alleging that the manufacturers were responsible for her husband's asbestos-exposure injuries and resulting death.  
Prior to trial, all defendants with the exception of Owens-Corning settled or were dismissed.  
Spain
, 304 Ill. App. 3d at 358.  

Owens-Corning then moved 
in limine
 to be allowed to present decedent's videotaped deposition testimony concerning decedent's multiple asbestos exposures unrelated to Owens-Corning.  The 
Spain
 court refused to admit this evidence pursuant to 
Lipke v. Celotex Corp.
, 153 Ill. App. 3d 498 (1987), another asbestos-related decision.  In 
Lipke
, the appellate court held that a party "guilty of negligence cannot avoid responsibility merely because another person is guilty of negligence contributing to the same injury."  
Lipke
, 153 Ill. App. 3d at 509.  The 
Lipke
 court concluded that "the fact that plaintiff used a variety of asbestos products does not relieve defendant of liability for his injuries.  Evidence of such exposure is not relevant." 
 Lipke
, 153 Ill. App. 3d at 509.
  The 
Spain 
court thus excluded evidence of decedent's other asbestos exposures.  
Spain
, 304 Ill. App. 3d at 365.  

In contrast, an entirely different set of circumstances shaped our supreme court's decision in 
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83 (1995).
  In 
Leonardi
, plaintiffs, as administrators of decedent's estate, brought a medical malpractice action against several defendants seeking damages stemming from an improperly performed Cesarean section procedure.  Prior to trial, decedent's attending physician (a named defendant in the malpractice suit) died and his estate settled.  Plaintiffs then moved 
in limine
 to bar evidence relating to the alleged negligence of any person other than the remaining named defendants.  The trial court denied the motion and allowed evidence relating to the deceased attending physician's standard of care.  
Leonardi
, 168 Ill. 2d at 90-92.  The appellate court upheld the trial court's ruling.  
Leonardi v. Loyola University of Chicago
, 262 Ill. App. 3d 411, 415-16 (1993).

On appeal to the Illinois Supreme Court, plaintiffs argued that the trial and appellate courts erred in denying their motion 
in limine
 predicated on the "common law principle that there can be more than one proximate cause of an injury, and that a person is liable for his or her negligent conduct whether it contributed wholly or partly to the plaintiff's injury 
as long as it was one of the proximate causes of the injury
."  (Emphasis in original.)  
Leonardi
, 168 Ill. 2d at 92-93, citing 
Nelson v. Union Wire Rope Corp.
, 31 Ill. 2d 69, 88 (1964).

The 
Leonardi
 court held that plaintiffs' reliance on this principle was misplaced, as it "presumes that a defendant's conduct is at least 
a
 proximate cause of the plaintiff's injury."  (Emphasis in original.)  
Leonardi
, 168 Ill. 2d at 93
, citing Restatement (Second) of Torts §433B, Comment g (1965).  "In the present case, defendants denied that they were even partly a proximate cause of plaintiffs' injuries.  Rather, the defense theory was that decedent's [deceased attending physician] was the sole proximate cause of [decedent's] injuries."  
Leonardi
, 168 Ill. 2d at 93
.  The court concluded that "'an answer which denies that an injury was the result of or caused by the defendant's conduct is sufficient to permit the defendant in support of his position to present evidence that the injury was the result of another cause.'"  
Leonardi
, 168 Ill. 2d at 94
, quoting 
Simpson v. Johnson
, 45 Ill. App. 3d 789, 795 (1977).  

The 
Spain 
court clearly recognized
 the difference between the case before it and the situation presented in 
Leonardi
, noting:

"The 
Leonardi
 court found the 
Lipke
 standard 
inapplicable to medical malpractice cases
, but did not change the law governing asbestos cases.  Because asbestos-related diseases cannot be linked to one fiber or a particular defendant, Illinois courts have long recognized the difficulty in determining whether a specific asbestos exposure caused or contributed to a person's asbestos-induced injury or death.  Thus, to assist plaintiffs in proving proximate cause, the supreme court adopted the 'frequency, regularity and proximity,' or '
de minimis
,' test in 
Thacker
."  (Emphasis added.)
  Spain
, 304 Ill. App. 3d at 364-65.  

See 
Thacker v. UNR Industries, Inc.
, 151 Ill. 2d 343, 358-59 (1992) (discussing the 
de minimis
 exposure test used to determine proximate cause in asbestos cases). 

 The case before us indisputably involves medical malpractice rather than asbestos exposure.  Thus, 
Leonardi
 controls and 
Spain
, which applies
 
only to asbestos cases, is inapposite.  
Spain
, 304 Ill. App. 3d at 364-65.  

Proximate cause is an element of the 
plaintiff's 
case.  
Leonardi
, 168 Ill. 2d at 94. 

"[I]n negligence actions, the plaintiff must present evidence of proximate causation, which includes both 'cause in fact' and 'legal cause.'  [Citations.]  A plaintiff may show 'cause in fact' under the substantial factor test, showing that the defendant's conduct was a material element and substantial factor in bringing about the alleged injury.  [Citations.]  'Legal cause' examines the foreseeability of injury -- whether the injury is '"of a type which a reasonable man would see as a likely result of his conduct."'  [Citations.]"  
Donaldson v. Central Illinois Public Service Co.
, 199 Ill. 2d 63, 90 (2002).             

Leonardi
 stands for the proposition that "'an answer which denies that an injury was the result of or caused by the defendant's conduct is sufficient to permit the defendant in support of his position to present evidence that the injury was the result of another cause.'"
  
Leonardi
, 168 Ill. 2d at 94, quoting 
Simpson v. Johnson
, 45 Ill. App. 3d 789, 795 (1977); 
Wojcik v. City of Chicago
, 299 Ill. App. 3d 964, 971 (1998).  The record clearly demonstrates that Dr. Kucich and CMA each filed such an answer in the present case.

Leonardi
 requires us to hold that the trial court erred in relying on 
Spain 
when it excluded evidence of the Hickory physicians' alleged postoperative negligence as irrelevant to the issue of proximate cause.  Because the disputed evidence should have been allowed, we also hold that the trial court abused its discretion in refusing to give the relevant jury instruction on sole proximate cause (IPI Civil 3d, No. 12.04).  
Leonardi
, 168 Ill. 2d at 101-02, quoting 
Lowe v. Norfolk Western Ry. Co.
, 124 Ill. App. 3d 80, 118 (1984) ("'All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction'").  
   

Plaintiffs attempt to cloud the issue by arguing that Petre's "injury" was not his sternal debridement and resulting reconstructive surgery but, rather, the infection itself.  Plaintiffs reason that because the Hickory physicians had no part in failing to prescribe prophylactic vancomycin for Petre, they could not have been the sole proximate cause of Petre's infection; thus, the Hickory physicians could not be held liable for Petre's ultimate injuries (sternal debridement and reconstructive surgery) as a matter of law.  We find this argument unpersuasive.  Petre bears the burden of 
establishing the nature of his injury as an element of the cause of action.  
Leonardi
, 168 Ill. 2d at 93.  It is axiomatic th
at resolving conflicting evidence with respect to the nature of a plaintiff's injuries and determining any resulting damages is the sole responsibility of the jury.  
See 
Cirrincione v. Johnson
, 184 Ill. 2d 109, 116 (1998) (holding that "it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight to give to a witness' testimony").
  Contrary to plaintiffs' position, the admission of the contested evidence on remand will provide a sufficient basis from which a reasonable jury might conclude that: (1) Petre's postoperative infection occurred entirely in the absence of negligence
; (2) Dr. Kucich did not violate the standard of care in failing to prescribe prophylactic vancomycin
; (3) the Hickory physicians were in fact negligent in failing to detect Petre's infection in a timely manner; and (4) had the Hickory physicians timely diagnosed and treated Petre's infection, sternal debridement and reconstructive surgery would have been unnecessary.  W
hether a properly instructed
 jury will find Dr. Kucich liable for the full extent of Petre's injuries will ultimately be determined by that jury's verdict
.   

II. Expert Testimony

Our disposition of the previous issue requires that we remand this case to the trial court for further proceedings and vitiates the need for us to address defendants' remaining arguments on appeal.  However, in the interest of judicial economy, we elect to address an issue likely to recur on remand.  
People v. Radovick
, 275 Ill. App. 3d 809, 816 (1995).  Dr. Daniel Hirsch, defendants' expert, who diagnosed Petre's sternal wound infection
, testified via videotaped evidence deposition 
with respect to, 
inter alia
, the effectiveness of different types of prophylactic antibiotics
.  
Dr. Hirsch testified that from 1993 through 1997,
 he was employed as an infectious disease specialist and epidemiologist at Elmhurst Hospital.  During that time, his duties as an epidemiologist included compiling statistics on the frequency of various types of postoperative infections at the hospital
, including sternal wound infections. Dr. Hirsch offered the opinion that vancomycin was less effective than Ancef as a prophylactic antibiotic with respect to MRSE organisms.  

Prior to trial, plaintiffs moved 
in limine
 (hereinafter Plaintiffs' Motion 
in limine
 No. 6)
 to bar defendants from presenting any evidence to the jury relating to
 one of Dr. Hirsch's unpublished statistical compilations, known as the Elmhurst study.  Citing 
Duran v. Cullinan
, 286 Ill. App. 3d 1005, 1010-11 (1997), plaintiffs argued that in light of Dr. Hirsch's admissions that the results of the Elmhurst study were not "statistically significant" and that the study had not been accepted by the medical community as authoritative, the study did not satisfy the minimum evidentiary requirements in Illinois for admissibility under the standard enunciated in 
Frye v. United States
, 293 F. 1013
 
(D.C. Cir. 1923).  See 
Donaldson v. Central Illinois Public Service Co.
, 199 Ill. 2d 63, 76-77 (2002) (affirming that "the exclusive test for the admission of expert testimony [in Illinois] is governed by the standard first expressed in 
Frye
").             
 

Plaintiffs further argued that because defendants failed to provide to plaintiffs "the study protocol and all underlying data concerning the study" during discovery, permitting Dr. Hirsch to testify about the specifics of the study would have violated Supreme Court Rule 213 (177 Ill. 2d R. 213).    
 

After hearing argument on plaintiffs' motion, the trial court ruled:

"[B]ased on my review of the case law, not only cited by the plaintiff in his written motion, but the Walski case and it's [
sic
] follower cited by the defense, the Court is going to grant the motion over [defendants'] objection.

And the Court will state, however, that obviously [Dr. Hirsch] can testify to his experiences, the patients he dealt with in the study.  He just can't testify to the study and its results."

We first note that plaintiffs misconstrue 
Frye
.  "The 
Frye
 standard, commonly called the 'general acceptance' test, dictates that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.'  
Frye
, 293 F. at 1014."  
Donaldson,
 199 Ill. 2d at 77.  "'[G]eneral acceptance' does not concern the [expert's] ultimate conclusion.  Rather, the proper focus of the general acceptance test is on the underlying methodology used to generate the conclusion.  If the underlying method used to generate an expert's opinion [is] reasonably relied upon by the experts in the field, the fact finder may consider the opinion -- despite the novelty of the conclusion rendered by the expert."  
Donaldson,
 199 Ill. 2d at 77.

Dr. Hirsch testified that he generated the results of the Elmhurst study by means of a "progression analysis," which is a form of statistical comparison.  
Plaintiffs do not dispute the general acceptance of statistical analysis as a method of determining rates of infection in the field of epidemiology.  Whether Dr. Hirsch chose to publish the Elmhurst study or whether he found the results to be "statistically significant" is irrelevant to its admissibility under 
Frye
. 
 
Plaintiffs' argument thus fails.

Although 
Frye
 cannot be read to bar the admission of Dr. Hirsch's Elmhurst study,  Rule 213 (177 Ill. 2d R. 213) is another matter. 
 We may affirm the judgment of the trial court on any basis apparent from the record.  
Allstate Insurance Co. v. Davenport
, 309 Ill. App. 3d 750, 756 (1999).  
"[T]he admissibility of evidence is a matter within the sound discretion of the trial judge, whose decision will not be reversed absent a clear abuse of discretion."  
Hilgenberg v. Kazan
, 305 Ill. App. 3d 197, 204 (1999).  Expert testimony may be barred where there is inadequate disclosure of all opinions and the "bases therefor."  
177 Ill. 2d R. 213(g)(ii); 
Firstar Bank of Illinois v. Peirce
, 
306 Ill. App. 3d 525, 536 (1999).
 

In their brief, plaintiffs argue that the Elmhurst study was properly barred under Rule 213:

"All that was provided to plaintiffs during discovery was Dr. Hirsch's testimony concerning his conclusions as a result of the study.  For the study to have been admissible, plaintiffs should have been provided with the study protocol and all underlying data concerning the study so that plaintiffs could properly cross-examine Dr. Hirsch * * * and otherwise respond to the validity of the study."

The record reflects that in response to plaintiffs' Rule 213 interrogatories, Dr. Kucich disclosed only that Dr. Hirsch would testify "consistent with his discovery deposition," 
i.e.
, to his conclusions based on the Elmhurst study.
(footnote: 2)    

Defendants do not dispute their failure to disclose to plaintiffs the data and protocols underlying the Elmhurst study; rather, defendants argue (as they did before the trial court) that "calling it a study or calling it [Dr. Hirsch's] personal experience, it's the same thing.  It's his personal experience, his firsthand tabulation as epidemiologist at Elmhurst [Hospital]."  Defendants cite 
Hilgenberg v. Kazan
, 305 Ill. App. 3d 197 (1999), as authority for the proposition that Dr. Hirsch's personal experience in performing the statistical analyses underlying the Elmhurst study formed a sufficient basis for his opinion with respect to the results of the study.

We disagree.
  
In 
Wilson v. Clark
, 84 Ill. 2d 186, 193-96 (1981), our supreme court adopted Federal Rules of Evidence 703 and 705, thereby allowing experts to give opinion testimony based on information not admitted into evidence so long as that information is itself sufficiently reliable:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence * * * ."  Fed. R. Evid. 703.  

"If the trial court determine[s] that the underlying data [are] of the sort that is typically relied upon by experts in forming opinions, the expert may reveal the data, not as substantive evidence, but for the limited purpose of explaining his opinion."  
Hilgenberg
, 305 Ill. App. 3d at 207, citing 
City of Chicago v. Anthony
, 136 Ill. 2d 169, 185-86 (1990).

In
 Hilgenberg
, this court held that where a physician
 testifying for the defense had authored an article based on a review of 11 of his own patients' files, conducting such a review in preparing the article was a standard research technique involving data reasonably relied upon by medical experts. We therefore held that the trial court did not err in determining the underlying data to be reliable and admitting the article.  
Hilgenberg
, 305 Ill. App. 3d at 209.  W
e also reiterated the long-standing rule that an expert "may rely on his own experience and 'first-hand observation'" in offering opinions
.  
Hilgenberg
, 305 Ill. App. 3d at 209, quoting 
Wilson
, 84 Ill. 2d at 193.
 

The "personal experience" at issue in 
Hilgenberg
 
was that of testifying physicians with respect to treating 
their own
 patients.
  Nothing in the record indicates that any of the patients in the Elmhurst study were Dr. Hirsch's own. 
 
Hilgenberg
 is of no help to defendants
 in the present case.

Similarly, the fact that Dr. Hirsch performed the statistical analyses upon which the Elmhurst study was based does not bring the medical care of the patients who were the subjects of the study
 -- the "data" underlying the study 
-- within the realm of Dr. Hirsch's personal experience. 
 Wilson
, 84 Ill. 2d at 193.  
By defendants' reasoning, any expert who performs a statistical analysis is entitled to testify to the results of that analysis, the proponent party's failure to disclose the factual basis underlying that analysis
 under Rule 213 notwithstanding.  We cannot espouse such a rule. 

Disclosures under Rule 213 are mandatory, and strict compliance is required.  
Copeland v. Stebco Products Corp.
, 316 Ill. App. 3d 932, 938 (2000).  Rule 213 is intended to discourage strategic gamesmanship.  
Copeland
, 316 Ill. App. 3d at 937.  As plaintiffs correctly point out, defendants' failure to disclose the protocols and data underlying the Elmhurst study denied plaintiffs the opportunity both to have their own experts evaluate the study and to appropriately cross-examine Dr. Hirsch.  After a careful review of the record, we cannot say that the trial court abused its discretion in excluding evidence of the Elmhurst study.  
Hilgenberg
, 305 Ill. App. 3d at 204.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed and the cause is remanded for a new trial consistent with this opinion.

Affirmed in part and reversed in part; cause remanded for new trial.

TULLY and COUSINS, JJ., concur.

FOOTNOTES
1:  The parties do not dispute that Petre's infection was caused by MRSE organisms.

2:  The record reflects that defendant CMA did not file a separate response to plaintiffs' Rule 213 interrogatories.  The record further reflects that Dr. Hirsch did not disclose either the data or the protocols underlying the Elmhurst study in his discovery deposition.